722 P.2d 321

**Judith Lee SCHNEIDER, as surviving spouse of Gary E. Schneider, and as Personal Representative of the Estate of Gary E. Schneider, deceased, for herself and for the benefit of Eugene T. Schneider and Rosa Lee Schneider, Plaintiff-Appellant,**

v.

**CESSNA AIRCRAFT COMPANY, Defendant-Appellee.**

**No. 1 CA–CIV 7172.**

Court of Appeals of Arizona, Division 1, Department B.

Aug. 8, 1985.
Review Denied July 8, 1986.

Molloy, Jones, Donahue, Trachta, Childers & Mallamo, P.C. by John F. Molloy, David A. McEvoy, Tucson, for plaintiff-appellant.

O'Connor, Cavanagh, Anderson, West-over, Killingsworth & Beshears by Larry L. Smith, John H. Killingsworth, Michael W. Carnahan, Phoenix, for defendant-appellee.

## OPINION

KLEINSCHMIDT, Judge.

This appeal arises from a jury verdict against plaintiff-appellant in a wrongful death action that arose out of the crash of a Cessna aircraft. The plaintiff is the widow of the deceased pilot. She brought an action against Cessna in strict liability. She also sued Northland Aviation. Northland had trained the pilot and rented the Cessna aircraft to him. Her action against Northland was based on negligence. The case against Cessna centered on the plaintiff's theory that the airplane was designed in such a way as to make it difficult to drain water from a critical point in the fuel line, and that when the water froze in the line it caused the plane to crash.

The jury returned a verdict in favor of the plaintiff against Northland Aviation, and in favor of Cessna against the plaintiff. This appeal involves only the verdict in favor of Cessna.

The appellant has raised the following issues:

1) Whether the trial court erred in failing to instruct the jury on Cessna's duty to warn about the potential danger of operating the aircraft in freezing weather;

2) Whether the trial court erroneously admitted a Federal Aviation Administration (FAA) videotape entitled "Stalling for Safety;"

3) Whether it was error for the trial court to admit the following items of evidence:

a) evidence that the Cessna aircraft had a good safety record with few crashes attributable to the accumulation of ice in the fuel system;

b) testimony of certain of Cessna's expert witnesses whose identities were dis-closed to plaintiffs only 28 days before trial;

4) Whether the trial court erroneously precluded the plaintiff from introducing the following items of evidence:

a) an FAA publication circulated in the southwestern part of the United States which warned Cessna operators of the problems of draining water from the fuel system;

b) rebuttal evidence offered by the plaintiff in order to show that the FAA "approval" of the Cessna fuel system was predicated upon an erroneous summary by the FAA of its own data;

c) the formal response of the National Transportation Safety Board to the published call for comment by the FAA which showed problems with the Cessna plane;

d) a Cessna interoffice communication which was purportedly evidence that the FAA withdrew its proposed rule in exchange for Cessna's installation of a quick drain.

## FACTS

On November 27, 1979, Gary Schneider and a friend were killed when their Cessna Model 152 aircraft crashed. As the pilot, Schneider had rented the plane from Northland Aviation, which was in the business of renting and maintaining aircraft. Schneider had previously been trained by Northland.

Schneider rented the plane for the purpose of spotting elk. The two men left the Flagstaff Airport sometime before 7:30 a.m.; the exact time is unknown because there were no witnesses who saw them depart. Around 8:50 that morning, the plane crashed in a clearing eight miles south of Flagstaff.

Shortly before the crash, three eye-witnesses saw and heard the aircraft flying low over a forested area with the engine cutting in and out, heading toward the only clearing in the area. A fourth eyewitness heard a plane with engine trouble and watched it as it circled the clearing once or twice, before it suddenly went into a nose

dive. The testimony reveals that Schneider was flying from anywhere between 200 and 500 feet above the ground. All the experts who testified described the plane as having had a stall-spin accident. A subsequent investigation by the National Transportation Safety Board (NTSB) discovered no mechanical malfunctions or defects.

It was appellant's contention that this particular model, the 152, had a fuel system which was hazardous in freezing weather because it permitted water to accumulate at the lowest point in the fuel system. The water would then freeze and clog the fuel line either by expanding or by moving to a point where it impeded the flow of fuel.

The plaintiff's experts expressed the opinion that Schneider had a blockage in the fuel line and was trying to get the engine to function while he was circling the clearing. According to the experts, he stalled because of insufficient air speed and went into the ground in a stall-spin.

The ground temperature at the time of Schneider's takeoff from Flagstaff was 27 degrees Fahrenheit, while the temperature at the time of the crash was 32 degrees.

The plaintiff had three different theories upon which she based her case against Cessna: 1) the defective design of the fuel system; 2) improper instructions as to how to drain water from the fuel line; and 3) Cessna's failure to warn of the hazards of flying the plane in freezing weather.

To understand the claims and defenses raised on appeal, it is necessary to understand the relationship between the claim against Cessna and the claim against Northland Aviation. The plaintiff's case against Northland was based on negligent conduct: 1) the negligent failure to properly maintain the plane by draining the fuel system at the fuel line tee-fitting after every 100 hours of flight; and 2) teaching Schneider an improper method of recovering from a stall-spin. As we have already observed, the jury found Northland negligent, but found in favor of Cessna against Schneider. Northland has not appealed.

## THE FUEL SYSTEM

The Cessna 152 fuel system, and whether it was defective, is at the heart of plaintiff's claim against the manufacturer of the airplane. All aviation fuel contains water in small amounts, and there are standard safeguards to avoid the problems it creates. When the water is unfrozen, it is heavier than fuel and it separates and accumulates at the low point in the fuel system. Generally, then, proper safety procedure requires that the fuel system be drained at the low point in the system before flying. A drain is usually provided at the low point in the system to accomplish this. In the model 152, the low point in the fuel system is a tee-fitting which projects about ¼ of an inch below the fuselage of the aircraft, where it is exposed to the outside air temperature. If water freezes in the fuel line, it can block or impede the flow of fuel and cause engine failure. Plaintiff's experts hypothesized that water accumulated at the tee-fitting and formed an ice pellet which loosened during flight due to the heat from the exhaust, bobbed up into the fuel line and impeded the flow of fuel. A partially restricted fuel line results in the engine cutting in and out which is consistent with what witnesses on the ground said they heard.

The plane that crashed did not have a quick drain at the tee-fitting, the low point in the fuel system. As the name implies, a quick drain is a device which permits easy, quick drainage without resort to disassembly of the fuel system. Rather, this airplane had quick drains at three other points in the system: one on each wing fuel tank and one at the "gascolator" or fuel strainer.

Besides alleging a design defect in the fuel system, the appellant contended that Cessna's instructions on draining water from the fuel line were inadequate. Specifically, the Cessna Pilot's Operating Handbook suggested that the pilot perform a pre-flight check of the drains on each wing tank and at the gascolator for any accumu-

lated water. According to plaintiff's experts, these instructions were inadequate because the low point in the fuel system, the tee-fitting, is the most critical spot to test for the presence of water. Drainage at the sumps on the wing tanks located above the tee-fitting would not remove water which had settled to the tee-fitting. Draining at the tee-fitting was a laborious two-man process.

Appellant faulted Cessna for failing to recommend draining the tee-fitting before every flight; the manufacturer only suggested draining at the tee-fitting after every 100 hours of flying time, or when drainage from the gascolator revealed the presence of water. Either of these two procedures, the appellee suggests, was adequate to maintain a water-free tee-fitting.

The appellant also complained about the lack of directions as to the location of the tee-fitting drain plug, about the laborious process required to drain the tee-fitting, and criticized the lack of any instruction from Cessna on catching the discharge from the gascolator in a cup for observation of water. There was testimony that pilots generally discharged the gascolator fuel on the ground, a practice which makes it difficult to detect the presence of water.

The plaintiff's final theory against Cessna was that the company failed to warn of the hazards of flying the Model 152 aircraft in freezing weather. They argue that the desired warning would have linked the failure to drain the fuel system properly to a possible subsequent engine failure in freezing temperatures.

## FAILURE TO GIVE A WARNING INSTRUCTION

The appellant initially contends that the trial court erred in failing to instruct the jury on the duty to warn about the potential danger of operating the 152 model aircraft in freezing weather. Although the appellant properly requested an instruction regarding the need to give this warning, the trial judge refused to give it, apparently because the judge thought that such an instruction was only proper in unusual

cases, as where an ethical drug is flawlessly made but may nonetheless be harmful if not properly used.

The appellant argues that a product may be "defective" or "unreasonably dangerous" because of the failure to give an adequate warning. See *Tucson Industries, Inc. v. Schwartz*, 108 Ariz. 464, 501 P.2d 936 (1972); *Shell Oil Co. v. Gutierrez*, 119 Ariz. 426, 581 P.2d 271 (App.1978); *Kavanaugh v. Kavanaugh*, 131 Ariz. 344, 641 P.2d 258 (App.1981). The appellant urges that if a request is made for a proper jury instruction, it is reversible error for the trial court to refuse to instruct on a theory which is within the issues and supported by substantial evidence. See *Gaston v. Hunter*, 121 Ariz. 33, 588 P.2d 326 (App.1978).

Cessna, on the other hand, defends the court's refusal to give a warning instruction on the basis that since the jury found in favor of Cessna on Schneider's strict liability claim, it must necessarily have concluded that the "defect" did not in fact exist. According to Cessna, if any defect existed, it would have been inherent in the design of the fuel system, not in the lack of a warning as to the hazards of flying the aircraft in below-freezing weather.

Although the instruction about a warning was not given, the trial court did give a jury instruction on the duty to give adequate directions for the use of a product. There is, however, a distinction between a warning instruction and a directions instruction:

> Instructions are to be followed to secure the most efficient or satisfactory use of the product; warnings are instructions as to *dangers* that might occur if the directions are not followed.

*Brown v. Sears, Roebuck & Co.*, 136 Ariz. 556, 564, 667 P.2d 750, 758 (App.1983). (Emphasis in original).

The directions instruction given by the court read as follows:

> A party who manufactures or sells a product which he has reason to foresee may cause injury from a particular use, is required to give adequate directions

for safe use of the product. If he fails to do so, he is liable for any injury resulting from the failure to give adequate directions.

On the other hand, the court rejected the following warning instruction:

A party who manufactures or sells a product which he has reason to foresee may cause injury from a particular use, is required to give an adequate warning of the danger. If he fails to do so, he is liable for any injury resulting from the failure to warn.

■ The trial court's refusal to submit the requested warning instruction was error. If there was any evidence tending to establish Schneider's theory that Cessna's failure to warn made the product defective, the instruction should have been given. *Correa v. Curbey,* 124 Ariz. 480, 605 P.2d 458 (App.1979). *Brown* established the proposition that the failure to warn can make a product defective and/or unreasonably dangerous if the plaintiff failed to follow directions because of the absence of a warning. Thus, we conclude that Schneider was entitled to have the jury assess her theory that Cessna owed a duty to warn against flying in subfreezing weather without draining the tee-fitting, particularly if water was found upon draining the gascolator.

The focal point of our decision is *Brown,* which was a wrongful death action in which the decedent was electrocuted while he was operating a portable electric saw. He was using the saw with a frayed extension cord and a second ungrounded extension cord. The manufacturer's instructions directed that the saw be used only with a grounded extension cord. The plaintiff proceeded on a theory that Sears had failed to provide adequate instructions and warnings concerning the operation of the saw and that this failure rendered the saw defective and unreasonably dangerous to the decedent. The decedent's personal representative appealed the trial court's entry of summary judgment against her.

On appeal, the personal representative claimed that there was a genuine issue of fact as to whether the saw was unreasonably dangerous in the absence of a warning to the effect that if it was operated with an ungrounded extension cord there was a substantial risk of electrocution. The court of appeals reversed, reasoning that there was a genuine issue of fact on this question. We concluded that we could not say:

[A]s a matter of law, that the red tag in the saw carton and the instruction booklet provided with the saw cautioning of the danger of 'shock' was of a degree of intensity that would have caused the Decedent to exercise for his own safety caution commensurate with the potential danger of death.

*Brown,* 136 Ariz. at 565, 667 P.2d at 759. Simply put, we concluded that reasonable people might find that the decedent would have followed the directions if the severity of the risk of ignoring them had been meaningfully brought home to him.

In *Brown* we knew that the deceased did not follow the manufacturer's directions. Here, the deceased may not have followed them. It is entirely possible that he did not, but would have, had he been warned that flying in freezing weather without draining the tee-fitting could result in engine failure.

Cessna argues that because the jury found for Cessna it necessarily determined that the fuel system on the Model 152 was not defective so the need to warn never arose. The appellant's response to this is that the jury may have found that the product was defective but not unreasonably dangerous. If that were the case, the appellant reasons, the jury might have reached a different conclusion if it had been told that Cessna not only had a duty to instruct on the use of the plane, but also had a duty to warn of what could happen if the instructions were not followed and the plane was flown in freezing weather.

■ The trial court's refusal to give an instruction on the duty to warn precluded the jury from considering whether the lack of a warning made the aircraft defective and/or unreasonably dangerous. It is re-

versible error for the trial court to refuse to instruct the jury on a legal theory which is within the issues of the case and supported by substantial evidence. *Sparks v. Republic Nat. Life Ins. Co.*, 132 Ariz. 529, 539, 647 P.2d 1127, 1137, *cert. denied*, 459 U.S. 1070, 103 S.Ct. 490, 74 L.Ed.2d 632 (1982); *Gaston v. Hunter, supra.*

In the present case, substantial evidence was presented entitling plaintiff to an instruction on Cessna's duty to warn of engine failure in subfreezing temperatures. There was credible evidence that the product was "defective" and/or "unreasonably dangerous" because of a failure to warn. Such a determination depends upon, among other things, foreseeability, seriousness and cost of prevention. *Shell Oil Co. v. Gutierrez*, 119 Ariz. 426, 434, 581 P.2d 271, 279, *quoting Hall v. E.I. DuPont De Nemours & Co.*, 345 F.Supp. 353, 368 (E.D.N.Y. 1972).

There was evidence of foreseeability. The appellant introduced numerous incidents of forced landings and crashes which were attributable to ice in the tee-fitting. The accidents had occurred for at least five years before Schneider's death. Also, Cessna knew of the adoption, in 1977, of a regulation requiring that all new planes had to have a quick drain at the lowest point in the fuel system. The seriousness of the problem arises from the very nature of airplanes. Based upon the evidence presented, it was reasonably arguable that the cost of such a warning was not disproportionate to the risk involved. Thus, the jury should have been able to assess Cessna's duty to warn, and should have decided "whether it was reasonably foreseeable that the user would fail to read the directions or fail to follow them, in the absence of a warning as to the consequences of such misuse." *Brown*, 136 Ariz. at 564, 667 P.2d at 758, *quoting* W. Kimble and R. Lesher, *Products Liability* § 199 at 210–11 (1979).

### ADMISSION OF VIDEOTAPE

The second challenge raised by appellant regards the trial court's decision to admit the videotape, "Stalling for Safety," over appellant's objection that it was inadmissible hearsay and unfairly prejudicial. The videotape was admitted under the "Learned Treatise" hearsay exception, Rule 803(18), Arizona Rules of Evidence. The question presented is a very close one but, as this particular trial unfolded, we do not believe the court erred in admitting the videotape.

Cessna introduced the videotape to support its theory that pilot inattention alone explained Schneider's stall-spin crash. "Stalling for Safety" is a FAA training film which discusses and depicts the prevalence of stall-spins due to pilot inexperience or pilot inattention. A narrator provides the commentary, description and safety tips, while the picture includes enactments of how pilots inadvertently enter stall-spins and how they then can recover control of their planes. Among other scenes, the videotape presents a pilot who, while circling a field to spot cattle, suddenly enters a stall-spin which the tape attributes to his distraction. In other words, the videotape contained a scenario similar to, if not almost identical to, Cessna's version of how the Schneider accident is supposed to have happened.

As both parties and the trial court recognized, the videotape is clearly hearsay. Rule 801(a), Arizona Rules of Evidence, defines a hearsay "statement" as either an oral or written assertion, or non-verbal assertive conduct. Thus, both audio and video portions of this videotape contained hearsay assertions to the effect that pilots often inadvertently put their aircraft into stall-spins.

The videotape was admitted under Rule 803(18), Arizona Rules of Evidence, which makes learned treatises admissible:

To the extent called to the attention of an expert witness upon cross-examination or relied upon him in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, *established as a reliable authority by the testimony or admis-*

**160**

sion of the witness or by other expert testimony or by judicial notice. *If admitted, the statements may be read into evidence but may not be received as exhibits.*

(Emphasis added.)

The argument is made that the videotape was not authenticated as an FAA production pursuant to Rule 902(5). The FAA seal at the start of the videotape made it self-authenticating under Rule 902(5), which posits:

> [E]xtrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to the following:
>
> \*   \*   \*   \*   \*   \*
>
> (5) Official publications. Books, pamphlets, or other publications purporting to be issued by public authority.

For a case in point *see California Ass'n of Bioanalysts v. Rank*, 577 F.Supp. 1342, 1355 n. 23 (C.D. Cal.1983). *See also* 5 Weinstein & Berger, *Weinstein's Evidence*, at 902–30 (1978). The mere fact that the videotape is an authentic FAA production, however, does not automatically qualify it as a "reliable authority" in terms of Rule 803(18).

The cross-examination testimony of appellant's expert, John LaMonica, is cited by Cessna to substantiate the authoritativeness of "Stalling for Safety":

Q   Would you be amazed if stall spins did occur in daylight outside of clouds?

A   In all the airplanes that fly, they probably have occurred. I think it would be much more likely if there was some other problem going on.

Q   The best place to find data on this or information about it would be from the FAA, wouldn't it?

A   That would be a good source, yes.

Q   It publishes a lot of material and films about stall spins, doesn't it?

A   Yes.

Q   And they are authoritative sources, aren't they?

A   They are pretty good; yes, sir.

Q   *You have seen one called, 'Stalling for Safety', haven't you?*

A   *I've seen, I think, all of those, I've seen many of those films and I don't remember the exact titles.*

Q   And they're a good training source, aren't they?

A   *I believe so; yes, sir.*

(Emphasis added). The highlighted testimony is relied upon heavily by Cessna in its contention that LaMonica had seen "all" of the FAA movies, which he had already acknowledged generally were authoritative sources.

The need to establish the reliability of an authority is well-established. *See, e.g., State Highway Dept. v. Willis*, 106 Ga. App. 821, 128 S.E.2d 351 (1962) (while expert witness may be cross-examined by reference to a standard treatise in the field of an expert's special knowledge to test his credibility, he cannot be cross-examined upon a treatise which has not been established as a standard treatise on the subject); *People v. Behnke*, 41 Ill.App.3d 276, 353 N.E.2d 684 (1976) (it was reversible error to permit cross-examination of an expert on government training manual written with view toward litigation, where the expert did not recognize the text and where the prosecution had not otherwise established the manual's authoritative nature); *Hemmingway v. Ochsner Clinic*, 608 F.2d 1040 (5th Cir.1979) (document written by two registered nurses was inadmissible as learned treatise where there was no testimony recognizing the document as a reliable authority).

■ Measured against the standard for establishing the authority of a learned treatise which these cases develop, LaMonica's testimony was adequate to establish "Stalling for Safety" as a reliable authority. In all probability, any number of expert witnesses who are familiar with aviation could view the tape and testify, based upon what they knew from other sources and what they had seen and heard in the videotape, that it was, or was not, authoritative and that it was, or was not, a source that experts could rely upon in forming their opinions. We do not think any combination

of magic words must be used to qualify an item for admission as an exception within the meaning of Rule 803(18). Nor do we believe that the qualifications of every narrator and actor in an informational film must be known and acknowledged, any more than every author alluded to in the footnotes of a medical text needs to be acknowledged as qualified. The significant point is that the tape was produced under the auspices of an agency which one would expect to have expert knowledge of the subject, and LaMonica's testimony was sufficient to satisfy the foundational requirement. The cases which the appellant relies on are really not to the contrary. For example, in *Farmers Union Federated Co-op. Ship. Ass'n v. McChesney*, 251 F.2d 441 (8th Cir.1958), the item sought to be introduced as a learned treatise was nothing more than a transcript of comments made during a symposium. The speakers were unidentified and one cannot conclude from reading the case that the comments had the blessing of the publisher. That is simply not the case with respect to this videotape.

Our confidence in our conclusion is strengthened by a review of the sparring that preceded the showing of the videotape to the jury. When LaMonica gave his initial testimony about the tape as an authoritative source, he was probably unaware that he was laying the foundation for its admission. In arguing against its admission, counsel for the appellant told the court that LaMonica had been mistaken in his testimony and that he had not previously seen this tape. The record shows that at the very time this argument was being made, LaMonica was present in the courtroom and the judge pointed out that all he had before him in evidence was the testimony that LaMonica had seen the film. Counsel for the appellant made no effort to recall LaMonica as a witness to correct any purported misstatement about whether he had previously seen the film and made no offer of proof on the subject. We do not suggest that counsel's argument was deliberately false. By the time that the argument was made, LaMonica had in fact

viewed the film. It is possible that he had not seen it before, but that if called to testify he would have had to acknowledge its authority. In any event, as the record stands, the foundation was sufficient.

The appellant has still another argument as to why the showing of the videotape was error. She says that items admitted under Rule 803(18) must be admitted in conjunction with the testimony of an expert witness while that expert witness is on the stand to explain the technical material. The best discussion of this position is found at 4 Weinstein & Berger, *supra*, at 803–329 and 803–330. In discussing the rule it says:

> It recognizes that the difficulty with learned treatises is not the usual hearsay danger of admitting unreliable evidence, but rather the possibility that the jurors will misunderstand and misapply the evidence without expert guidance. Consequently, Rule 803(18) admits only those treatises whose existence is disclosed while an expert is on the stand, either by the expert himself on his direct examination or by the questioner in the course of cross-examination. Limiting the admission of treatises to situations when an expert is testifying guarantees that the trier of fact will have the benefit of expert evaluation and explanation of how the published material relates to the issues in the case.

■ We agree that the procedure used here was not the best, and violated the spirit of the rule as discussed by Weinstein. However, there are three reasons why we do not think that the case should be reversed on this account:

1) The appellant raises this issue for the first time on appeal. She never brought this specific point to the trial judge's attention.

2) While no witness was on the stand while the film was shown, evidence in this form does not lend itself very well to the type of comment discussed in Weinstein. As a practical matter we assume that the best way to proceed would be to show the

entire videotape to the jury while the expert witness was available and then allow the expert witness to critique or explain the tape. The tape can be stopped at points where the expert wishes to explain or amplify what is depicted. Here, the appellant had every opportunity to follow that procedure on rebuttal and did not choose to do so.

3) The point for which the film was shown, that pilot inattention can lead to stall-spin crashes, is a simple one. Assuming that the source is authoritative, it is not the kind of thing that jurors will likely misunderstand or misapply unless they have expert guidance.

Finally, we note in passing that Rule 803(18) was also violated by the admission of the videotape as an exhibit in contravention of the rule's express admonition that "statements may be read into evidence but may not be received as exhibits." Again, the rule does not lend itself very well to videotapes. For the film to be shown to the jury, it would have to be introduced into evidence. Error of this type has generally been deemed harmless. *Garbincius v. Boston Edison Co.*, 621 F.2d 1171 (1st Cir.1980); *see Dawson v. Chrysler Corp.*, 630 F.2d 950, 961 (3d Cir.1980), *cert. denied*, 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981). In the absence of something in the record to indicate that the jury had a video machine so that they could review the tape during their deliberations, we will not assume that they were prone to misapply the evidence.

## EVIDENTIARY QUESTIONS

■ Since the case must be retried, we will address questions which may arise again. Cessna introduced evidence at trial through its executive engineer that the Model 152 had experienced only one incident of engine failure due to the formation of ice in the tee-fitting for every five million hours of flight. Since this case was tried, the Arizona Supreme Court, in *Jones v. Pak-Mor Mfg. Co.* 145 Ariz. 121, 700 P.2d 819 (1985), has re-examined the propriety of introducing evidence of safety history.

At the new trial, Cessna must bring the safety history it seeks to introduce within the dictates of *Jones, supra*, and establish the necessary foundational predicate for this type of evidence if it is to be admitted.

■ Appellant also complains that the trial court erred in allowing testimony of certain of Cessna's expert witnesses whose identities were first disclosed to the plaintiff's counsel only 28 days before trial. Rule 26(e)(1), Arizona Rules of Civil Procedure, requires that a party supplement his responses to interrogatories as to the identities of his expert witnesses "prior to 30 days before the date of trial." In light of our decision to reverse, we need only note that Cessna must timely disclose its expert witnesses at the new trial.

■ The trial court sustained Cessna's objection, based on lack of foundation, to a document offered by the appellant which was a certified copy of an FAA publication circulated in the Southwest United States. The document was a public report which was published to warn Cessna owners and operators that draining the gascolator would not drain the fuel system of water and that water could still freeze in the tee-fitting. As already noted in our discussion of the authenticity of the FAA videotape, the fact that the publication purports to be published by the government is enough to authenticate it under Rule 902(5), Arizona Rules of Evidence. Because it is more likely than not that Cessna had knowledge of the publication, it should have been admitted for the purpose of proving Cessna had notice of the claimed susceptibility of water to freeze in the tee-fitting—a factor which bears on Cessna's duty to warn.

■ Appellant points to the exclusion of evidence relating to incident reports that the FAA allegedly miscounted when it withdrew its Notice of Proposed Rule Making, which would have required Cessna to install a quick-drain at the tee-fitting. She sought to introduce such evidence in her rebuttal to discredit testimony introduced by Cessna in its case-in-chief. Rule 403,

Arizona Rules of Evidence, permits the trial court to exclude evidence when its probative value would be substantially outweighed by considerations of "undue delay, waste of time, or needless presentation of cumulative evidence." By precluding appellant from presenting evidence *ad infinitum,* we cannot say the trial court abused its discretion in acting in conformity with Rule 403. *See State v. Verive,* 128 Ariz. 570, 627 P.2d 721 (App.1981) (appellate court will review trial court's rejection of evidence for a reason listed under Rule 403 to determine if there was an abuse of discretion.) We also note that because there was already evidence that Cessna introduced a quick-drain modification for the tee-fitting after Schneider's accident, the trial court acted within its discretion in refusing to admit cumulative evidence in the form of a Cessna inter-office communication which purportedly indicated that the FAA withdrew its proposed rule change in exchange for Cessna's installation of a quick-drain at the tee-fitting.

■ The trial court also precluded appellant from introducing a formal response of the National Transportation Safety Board (NTSB) to a published call for a comment by the FAA. A year after the accident, the NTSB wrote the FAA that its review of this model's performance from 1975 to 1979 showed several accidents caused by the accumulation of ice and/or water in the fuel system of the aircraft. It recommended that Cessna install a quick-drain at the tee-fitting and that it modify its pilot handbooks to clarify how to alleviate the accumulation of ice in the fuel system. The trial court ruled the NTSB letter inadmissible. While appellant urges that the document is an agency record admissible under Rule 803(8)(B) or (C), Arizona Rules of Evidence, the trial court was acting within its discretion in excluding the document because it was collateral to any question of Cessna's conduct. The evidence went to whether the FAA knew what the NTSB thought at a particular time; the question before the jury, however, was whether Cessna had notice of an alleged defect in its fuel system.

While we have decided that the trial court did not abuse its discretion in precluding appellant from introducing these items of evidence, we do not rule definitively that the admission of such evidence would necessarily be error. On retrial the court must consider these issues on the basis of what is presented and exercise its discretion.

Based upon the foregoing, we reverse and remand for a new trial.

CONTRERAS and OGG, JJ., concur.