STANLEY G. SIMMONS VS. PETER M. YURCHAK.

No. 88-P-950.

Suffolk. November 16, 1989. - March 15, 1990.

Present: WARNER, C.J., ARMSTRONG, & KASS, JJ.

*Negligence*, Medical malpractice. *Evidence*, Hearsay, Pain, Videotape, Medical publication, Expert opinion, Consciousness of liability. *Doctor. Witness*, Expert. *Practice, Civil*, Instructions to jury, Objections to jury instructions, New trial.

At the trial of a medical malpractice claim, the judge properly declined to apply Proposed Mass.R.Evid. 803 (3) and excluded hearsay testimony relating the plaintiff's statements describing his physical condition, where the judge determined the evidence was untrustworthy and where the testimony was, in any event, cumulative of other evidence. [373-375]

At the trial of a negligence claim, the judge correctly ruled that G. L. c. 233, § 79C, pertaining to the admissibility of learned treatises, did not apply to an instructional videotape produced by the American Medical Association, and he properly excluded the videotape as evidence. [375-377]

There was no error at the trial of a medical malpractice claim in the judge's excluding two questions posed by plaintiff's counsel that did not reflect the correct standard by which a physician is to be judged in a malpractice action. [377-378]

At the trial of a negligence claim, the plaintiff did not preserve his right to raise the issue on appeal of the judge's refusal to give three requested jury instructions on the defendant's "consciousness of liability." [378-379]

The evidence at the trial of a medical malpractice claim warranted the jury's finding that the defendant had not been negligent; further, the judge properly denied the plaintiff's motion for a new trial. [380]

CIVIL ACTION commenced in the Superior Court Department on October 23, 1981.

The case was tried before *Elizabeth A. Porada*, J., and a motion for a new trial was heard by her.

*Jack J. Mikels* (*Rochelle S. Nelson* with him) for the plaintiff.

*Craig M. Brown* (*Robert P. Ingram* with him) for the defendant.

KASS, J. On special questions, a jury returned a verdict that the defendant Yurchak, a physician, had not been negligent in treating the plaintiff Stanley G. Simmons. We discuss some evidentiary issues which the plaintiff has raised and then comment in comparatively abbreviated fashion on the residual appellate points.

On November 17, 1978, Simmons, then age sixty-nine, suffered a stroke and was admitted to Massachusetts General Hospital. As a consequence of the stroke, Simmons is no longer able to work, he has trouble walking, and his field of vision is limited. During four weeks preceding the stroke, Simmons had complained to Dr. Yurchak about fever, fatigue, aches in his legs, chills, and headaches.

The plaintiff's case is that Dr. Yurchak negligently failed to diagnose his patient's subacute bacterial endocarditis, an infection of the valves of the heart, and that the disease led to the stroke. The alleged causal sequence was that the subacute bacterial endocarditis produced a mycotic (infectious) aneurysm in the brain. As to these claims the evidence was detailed and greatly in conflict. The defense position is that: Dr. Yurchak checked for subacute bacterial endocarditis; ordered and reviewed a blood culture[1] and muscle chemistry tests, among other diagnostic procedures; and reasonably arrived at a judgment that his patient was afflicted with a viral process. There was evidence that Simmons did not, indeed, have subacute bacterial endocarditis, i.e., there was no failure to diagnose that disease, and that the stroke had not been induced by an infectious aneurysm but was spontaneous.

The possibility of endocarditis was in the picture from the outset of the plaintiff's illness because in 1970 he had a deformed heart valve (mitral stenosis) replaced with a prosthetic one and at that time had been treated by Dr. Yurchak,

---

[1]Drawing repetitive blood samples to culture (three to six) is the norm because one culture may not produce an accurate result. There was evidence, however, that given the plaintiff's symptoms, drawing one blood culture was consistent with good medical practice.

whose specialty is cardiology. Persons with artificial valves have a high risk of endocarditis, particularly after dental procedures. Simmons knew this and had called Dr. Yurchak to tell him he was facing a tooth extraction and had been taking penicillin. Dr. Yurchak instructed Simmons to omit his regular dosage of an anti-coagulant medication, Coumadin, and to double the dosage of oral penicillin he was taking.[2]

1. *Exclusion of hearsay about Simmons' physical condition.* The plaintiff's son, Stuart, testified about his own firsthand observations of his father's physical condition in the weeks preceding the stroke. Under the hearsay exception that contemporaneous expressions of pain may be admitted, the son was allowed to describe with some detail what he learned about how his father felt. See *Bacon* v. *Charlton*, 7 Cush. 581, 586 (1851); *Weeks* v. *Boston Elev. Ry.*, 190 Mass. 563, 565 (1906); *Murray* v. *Foster*, 343 Mass. 655, 658 (1962); Liacos, Massachusetts Evidence 346 (5th ed. 1981). So it was that the son described how from November 1 to November 9, 1978, his father had experienced a burning sensation on the top of the head, pain in his tendons, and pain in his arms and legs. From November 11 to November 15, 1978, the burning sensation increased as did the pain in his tendons, with consequent increased weakness and lethargy. When he suffered the stroke, he was still weaker and lethargic, his head felt as if it were on fire, and he had pain in his muscles.

Such specific observations and statements of physical distress, the plaintiff argues, failed to round out the picture. They lacked the spice which would give flavor to the quality of the father's illness in the period before the stroke.[3] The

---

[2]Witnesses for the plaintiff testified that the proper prophylactic therapy would have been intramuscular injection of antibiotics, rather than oral dosage. Injections infiltrate into the blood stream at a faster rate. Evidence was received from defense experts that there was disagreement within the medical community concerning the superior wisdom and efficacy of injections and that there were risks attendant on intramuscular injection.

[3]Expressions of distress which the younger Simmons was prepared to testify to — and which were excluded — the younger Simmons described in an offer of proof as follows: "He had told me how weak he felt and that he had no energy and he had no desire to do anything, and, all [in] all, he

father had testified that he had felt "ten times worse" than the flu and otherwise described his condition in poignant terms. The plaintiff's description of his condition, his counsel argues on appeal, was likely to have been discounted by the jury when pitted against that of Dr. Yurchak, a respected cardiologist at the Massachusetts General Hospital, especially as the plaintiff's memory had become impaired by his stroke.[4] What plaintiff's counsel proposed to the trial judge, and what he presses on appeal, is that the occasion called for application of Proposed Mass.R.Evid. 803(3), which allows receipt of hearsay statements of the declarant's then existing state of mind, emotion, sensation, or physical condition.[5]

 The trial judge rightly resisted the invitation. She expressed her unease about the trustworthiness of generalized narrative statements about how a person feels which are offered for their truth, not through the declarant, but through the person to whom the statement was made, thus shielding the original statement from effective cross-examination. The judge ruled, as she would be bound to do were she operating under the proposed rules, on the question whether the capacity to mislead exceeded the probative value of the evidence offered. See Proposed Mass.R.Evid. 403. That question she resolved against receiving the statements. See *Ruszcyk* v. *Secretary of Pub. Safety*, 401 Mass. 418, 422-423 (1988).

---

just didn't feel anywhere near himself. He had to really push to go out in business. . . . He said that he had had a fever and that his fever was increasing on a daily basis. It was lower in the morning but in the afternoon it would go up again. It was never, at any time, did he mention to me that it was normal. . . . [From the sixteenth through the end of October his fever] was increasing. . . . [He said] [h]e was feeling very, very poorly. He was even more weak. . . . He had absolutely no energy at all. . . . [H]e could see the veins through his hand, like a road map."

[4]The trial judge expressed the view at side bar that the plaintiff's memory was "selective."

[5]Proposed Mass.R.Evid. 803(3) excepts from the exclusionary effect of the hearsay rule "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), . . . ." A full text of the proposed rules is reproduced as Appendix I in the 1989 supplement to Hughes, Evidence (1961).

Between the judge's determination of untrustworthiness and the cumulative nature of what the son, Stuart, had to offer in amplification of what had already been received from him and other witnesses, there is no occasion to consider whether a more expansive hearsay exception than the existing one (i.e., expressions of pain) should have been applied.[6] There is still less reason to apply — as the plaintiff also suggests — the catch-all exception to the hearsay rule which appears in Fed.R.Evid. 803(24) (1987), an exception prominently absent from the proposed Massachusetts rules.

2. *Admissibility of videotape under G. L. c. 233, § 79C.* Precisely what was inducing the fever and aches which afflicted Simmons for some four weeks had not been isolated when his stroke occurred. He had what the medical profession calls a "fever of unknown origin." Simmons sought, under G. L. c. 233, § 79C,[7] relating to learned treatises and articles, to place in evidence and allow to be viewed a videotape produced by the American Medical Association about "fevers of unknown origin." The videotape would demonstrate how a physician should approach the diagnosis and treatment of such fevers and, presumably, would illustrate Dr. Yurchak's deviation from the norms described. The judge ruled that G. L. c. 233, § 79C, did not apply to a videotape and excluded the proffered evidence.

---

[6] It is not self-evident that Proposed Mass.R.Evid. 803(3) propounds a more expansive hearsay exception than the common law "expression of pain" adverted to in this opinion. The advisory committee saw 803(3) as comporting with Massachusetts law. See Hughes, Evidence 465 (1989 Supp.). Liacos in Massachusetts Evidence, at 346, describes 803(3) as articulating a "comparable hearsay exception." The distinction has always been between expressions of "*present* existing pain or malady" (emphasis original) and narration about a condition, *Bacon* v. *Charlton,* 7 Cush. at 586, a distinction which the trial judge astutely observed.

[7] General Laws c. 233, § 79C, as appearing in St. 1965, c. 425, reads, in pertinent part: "Statements of facts or opinions on a subject of science or art contained in a published treatise, periodical, book or pamphlet shall, in so far as the court shall find that the said statements are relevant and that the writer of such statements is recognized in his profession or calling as an expert on the subject, be admissible in actions of contract or tort for malpractice, error or mistake against physicians . . . as evidence tending to prove said facts or as opinion evidence . . . ."

Certainly G. L. c. 233, § 79C, does not by any of its express language, extend to videotapes. That is unremarkable as videotapes did not exist in 1949, when § 79C was introduced into the statutory scheme by St. 1949, c. 183, § 1. If, in 1965, when the statute was last amended (St. 1965, c. 425), videotapes existed, they were not common currency. The plaintiff urges that the statute should be read contextually to effect its purpose and scope. See *Commonwealth* v. *Welosky*, 276 Mass. 398, 401-402 (1931); *Chipman* v. *Massachusetts Bay Transp. Authy.*, 366 Mass. 253, 256 (1974); *Murphy* v. *Bohn*, 377 Mass. 544, 547-551 (1979). Videotapes, the argument runs, are a contemporary variant of a published treatise, periodical, book, or pamphlet.

One may accept that videotapes are now frequently used for informational and instructional purposes, without accepting that there is a natural line of descent, for purposes of the statute, from learned treatises, periodicals, books, and pamphlets to videotapes. Published written works, with the added protection of the statute that the author be qualified as an expert on the subject at hand,[8] have an imprimatur of reliability flowing from the careful, professional criticism which attends the editorial and publishing process. So the Legislature might have determined when it enacted § 79C. See generally Kehoe, Massachusetts Malpractice Evidentiary Statute — Success or Failure?, 44 B.U.L. Rev. 10 (1964). Films, after all, were in wide use when § 79C was enacted and are not mentioned in it.

Whether similar care is attendant on instructional videotapes we do not know. The Legislature has resources superior to ours to investigate how videotapes are produced in the scientific community, what use is made of them, and to what extent that community accepts videotapes as authoritative. There may be sufficient difference between how written materials and videotapes are prepared for publication that our adding videotapes to the list of materials in § 79C would constitute judicial legislation. Judges may not legislate sim-

---

[8]See *Ramsland* v. *Shaw*, 341 Mass. 56, 63 (1960); *Jasper* v. *Tomaiolo*, 20 Mass. App. Ct. 201, 204 (1985).

ply because a statute lacks provision for a particular event or contingency. *Prudential Ins. Co.* v. *Boston,* 369 Mass. 542, 546-547 (1976). *Cox* v. *Boston Consol. Gas Co.,* 67 F.Supp. 742, 744-745 (D. Mass. 1946), aff'd, 161 F.2d 680 (1st Cir. 1947).[9]

3. *Exclusion of the "lesser standard" questions.* Among the witnesses whom the plaintiff called was a specialist in infectious diseases, Dr. Spivack. On two occasions, plaintiff's counsel put questions to Dr. Spivack about what might be thought to be a less refined standard of care than would be expected of one practicing cardiology, the defendant's specialty. Those questions were excluded. The first excluded question solicited Dr. Spivack's opinion whether the advice Dr. Yurchak gave to the plaintiff on August 14, 1978 (to double the dosage of oral penicillin), was in accordance with the degree of care and skill of the average qualified physician. The second excluded question inquired of Dr. Spivack how he would evaluate the performance of a medical student who had treated, as Dr. Yurchak did, a patient presenting the plaintiff's history, characteristics, and symptoms.

Neither question reflected the standard by which a physician is to be judged in a malpractice action: "whether the physician, if a general practitioner, has exercised the degree of care and skill of the average qualified practitioner, taking into account the advances in the profession," and, if a specialist, has exercised the "care and skill of the average member of the profession practising the specialty, taking into account the advances in the profession." *Brune* v. *Belinkoff,* 354 Mass. 102, 109 (1968). The resources available to the physician in each instance may be considered. *Ibid.*

---

[9]Plaintiff's counsel called to attention an Arizona case, *Schneider* v. *Cessna Aircraft Co.,* 150 Ariz. 153, 159-160 (Ariz. Ct. App. 1985), in which a training film about stall/spin crashes made by the Federal Aviation Association was admitted under a learned treatise exception, Ariz.R.Evid. 803(18) (1977). An aviation expert testified that FAA films were authoritative sources upon which aviators relied. That status appraisal made the circumstances of the admission of the training film distinguishable from the case at hand, even were we to be persuaded by the *Schneider* opinion's approach to treating a film as a learned treatise.

Under the *Brune* formulation, which continues to guide us, each specialist who treats a patient is judged by what is the accepted standard of care and skill for that physician's field. That Dr. Spivack specialized in the diagnosis and treatment of infectious diseases did not preclude him from discoursing, if he knew, about the standard of care and skill to be expected from a cardiologist. A medical expert may testify outside his or her area of expertise so long as the "witness has sufficient 'education, training, experience and familiarity' with the subject matter of the testimony." *Letch* v. *Daniels*, 401 Mass. 65, 68 (1987). *Samii* v. *Baystate Med. Center, Inc.*, 8 Mass. App. Ct. 911, 911-912 (1979). *Gill* v. *North Shore Radiological Associates*, 10 Mass. App. Ct. 885, 886 (1980). This approach recognizes that a physician practicing a specialty has been trained initially, and may practice, in a broader area. Cardiology and infectious diseases, for example, are subspecialties of internal medicine.

No doubt the plaintiff hoped to score points with the jury by his "what would any doctor know" questions. If the plaintiff could establish that not even a coarse standard of care had been met, the foundation would have been laid from which to launch an argument that a sophisticate at a tertiary care teaching hospital had surely fallen short. Questions which introduce standards of care other than those applicable to the case being tried, however, are likely to obscure the proceedings, at best, and misdirect them, at worst. The "lesser standard" questions were rightly excluded.

4. *Denial of certain jury instructions.* Among the instructions which the plaintiff requested at a charge conference were three dealing with inferences the jury might draw if they found that Dr. Yurchak had deliberately attempted to conceal facts through his office records or his hospital notes. If the jury so found, the plaintiff wished them instructed that they might take this as a manifestation that Dr. Yurchak thought he was liable for the plaintiff's injuries, i.e., a civil analog to the consciousness of guilt principle in the criminal law. See *Cohen* v. *Henry Siegel Co.*, 220 Mass. 215, 219 (1915); *Credit Serv. Corp.* v. *Barker*, 308 Mass. 476, 481

(1941); *Hillery* v. *Hillery*, 342 Mass. 371, 375 (1961); *Olof-son* v. *Kilgallon*, 362 Mass. 803, 806 (1973). The judge, after hearing argument in open court on this point, said she would not so charge.

At the conclusion of the instructions, the trial judge asked the plaintiff's counsel whether he had "any objections, suggestions, any corrections or any additional instructions you wish the court to give to the jury." The plaintiff's counsel offered several suggestions and requests, but did not touch on the "consciousness of liability" issue which had been raised in three supplemental requests for instructions.

On appeal, the plaintiff argues he was entitled to take the judge's initial rejection of his proffered instructions on "consciousness of liability" as preserving his rights. His position on the point had been made clear, he suggests. See *Caccavale* v. *Raymark Indus., Inc.*, 404 Mass. 93, 98 (1989). Yet counsel, after the charge, had asked: "Do I understand the objections that both of us made earlier are saved?" The judge responded: "Why don't you state them now because I have no idea what we'll do." Thereupon counsel stated his objection to the judge not having given certain enumerated instructions as requested.[10] The supplementary instructions regarding "consciousness of liability" were not included. In the circumstances, the right to raise the "consciousness of liability" issue on appeal was lost. The plaintiff did not object to the failure to give an instruction before the jury retired to consider its verdict. Mass.R.Civ.P. 51(b), 365 Mass. 816 (1974). See *Simon* v. *Solomon*, 385 Mass. 91, 107 (1982); *Weeks* v. *Harbor Natl. Bank*, 388 Mass. 141, 146-147 (1983); *Bank of Boston* v. *Haufler*, 20 Mass. App. Ct. 668, 671 n.7 (1985); Smith & Zobel, Rules Practice §§ 51.5 & 51.6 (1977 & Supp. 1990).

---

[10]Reference to requested instruction by number is ordinarily an insufficient way in which to bring a judge's attention to an alleged deficiency in a charge. *Narkin* v. *Springfield*, 5 Mass. App. Ct. 489, 491 (1977). It appears that reference by number may have been made in this instance with the consent of the judge. See *Callahan* v. *Boston Edison Co.*, 24 Mass. App. Ct. 950, 951 (1987).

5. *Denial of motion for a new trial.* In support of his contention that the evidence compelled a finding that the defendant had been negligent, the plaintiff argues that all witnesses testified that good practice required Dr. Yurchak to have physically examined his patient before the plaintiff's stroke occurred. The record does not support the plaintiff's claim. At least one defense witness was quite clear that a face-to-face physical examination would have been beneficial because it would have been reassuring to the plaintiff, but that it would not have advanced diagnosis or treatment of the plaintiff's illness. That evidence warranted the jury's finding that Dr. Yurchak had not been negligent and that it was not necessary to consider causation questions.

As to the weight of the evidence, which the plaintiff says warranted a new trial, there was abundant evidence that subacute bacterial endocarditis is often difficult to diagnose; that the plaintiff did not suffer from subacute bacterial endocarditis; and that the plaintiff's hemorrhage was spontaneous, perhaps related to anticoagulant medication which the plaintiff was required to take. It was open to the jury to find that Dr. Yurchak's care had been consistent with the standard of practice for cardiologists and that he had not been negligent. Given the conflict in the evidence, the judge did not abuse her discretion in denying the motion for a new trial. *Kord* v. *Baystate Med. Center, Inc.,* 13 Mass. App. Ct. 909, 910 (1982).

> *Order denying motion for*
> *new trial affirmed.*
> *Judgment affirmed.*