142 F.3d 83
 49 Fed. R. Evid. Serv. 183
 Jian An LI, Plaintiff-Appellant,
v.
Michael A. CANAROZZI, Steven Delluomo, Richard DiCenzo,
Joseph Morales, and Donald J. LaRosa, All Correction
Officers operating in the Metropolitan Correctional Center,
New York, a facility operated by the United States Bureau of
Prisons, Defendants-Appellees.
 Docket No. 97-6088.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 17, 1997.
Decided April 2, 1998.
 
 Jonathan Marks, New York City (Nelson M. Farber, New York City, on the brief), for Plaintiff-Appellant.
 Jonathan A. Willens, Assistant United States Attorney, New York City (Mary Jo White, United States Attorney for the Southern District of New York, Steven M. Haber, Assistant United States Attorney, New York City, on the brief), for Defendants-Appellees.
 Before: KEARSE and CARDAMONE, Circuit Judges, and LEISURE, District Judge.*
 KEARSE, Circuit Judge:
 
 
 1
 Plaintiff Jian An Li ("Li") appeals from a final judgment entered in the United States District Court for the Southern District of New York following a jury trial before Leonard B. Sand, Judge, dismissing his complaint brought pursuant to Bivens v. Six Unknown Named Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), and 42 U.S.C. § 1985(3) (1994) against federal corrections officers Michael A. Canarozzi et al., for alleged assault in violation of Li's constitutional rights. The jury found that Li had not proven his claim by a preponderance of the evidence, and the district court denied Li's subsequent motion for judgment as a matter of law or a new trial. On appeal, Li contends that he is entitled to a new trial on the ground that the court improperly excluded from evidence the deposition of one of Li's proposed witnesses. Finding no basis for reversal, we affirm.
 
 I. BACKGROUND
 
 2
 In November 1994, Li was a federal pretrial detainee at the Metropolitan Correctional Center ("MCC") in New York City; defendants were corrections officers at MCC. Li brought the present action for injuries he suffered at MCC on the night of November 10. The source of his injuries was sharply disputed.
 
 A. The Testimony at Trial
 
 3
 Li was housed in a section of MCC known as "11 South." At approximately 10 p.m. on November 10, 1994, in a multipurpose area of that section, some of the detainees and inmates (collectively "inmates") began fighting, using makeshift weapons including billiard balls, pool cues, and metal folding chairs. Several inmates were injured. One of the corrections officers on duty in that area at the time was also injured, and he and fellow corrections officer Maurice Mayes called for help. Other corrections officers arrived to disperse the combatants. Thereafter, the officers inspected all of the inmates in order to determine which ones had fresh injuries, and hence had likely been involved in the fighting, and to take those inmates to the special housing unit on the ninth floor ("9 South"). At trial, Mayes testified that he inspected Li in the aftermath of the fight and observed that Li had an injured right arm or hand.
 
 
 4
 Li testified at trial that he had not been involved in the intra-inmate altercation on 11 South and had received no injuries as a result of that fight. However, corrections officers handcuffed Li, along with two other inmates, Tang Xue-Dan ("Tang") and Lee Kiong Fui ("Lee" or the "Monk"), and took them to the ninth floor by elevator. Li testified that in the elevator, Canarozzi and another corrections officer, whom he could not identify, assaulted him. The other officer repeatedly slammed Li into the elevator wall, causing him to fall to his knees; Canarozzi then kicked Li in the back and stomped on his wrist, breaking his arm. Li introduced photographs taken of him that night, showing cuts and bruises on his face and a swollen right wrist. Li contended that the other corrections officers in the elevator had stood by and knowingly permitted the attack to take place.
 
 
 5
 In order to corroborate his testimony, Li sought to call as witnesses Tang and Monk. As discussed in Part I.B. below, Monk refused to testify. Tang testified that he, Monk, and Li, whose nickname was Gum Pai, were beaten by the corrections officers during the elevator ride. Upon further questioning, Tang testified that since he himself was being beaten and his head was held against the wall, he did not see the beating of Li:
 
 
 6
 Q. When you and Gum Pai and The Monk were in the elevator, do you know whether Gum Pai was beaten up?
 
 
 7
 A. I don't know. I really don't know. We were handcuffed and then we were all pushed in the elevator. I really don't know.
 
 
 8
 Q. So are you saying that you couldn't see Gum Pai when your head was facing the wall of the elevator; is that your testimony?
 
 
 9
 A. I could not see. My head was pushed against the wall. I could not see.
 
 
 10
 (Trial Transcript ("Tr.") 386.) Tang said that when he got off the elevator, he saw Li lying on the floor with a bruised face. Tang testified, however, that he had not noticed whether Li had any injuries prior to entering the elevator.
 
 
 11
 Defendants testified that no one was beaten in the elevator. Canarozzi testified that he made two elevator trips on the night in question. On one of those trips the inmate he was escorting tried to push away from the elevator wall, and Canarozzi leaned into the inmate to keep him secure; otherwise, Canarozzi had used no force against any inmate that night. Each of the other defendants testified that he had used no force whatever against any inmate in the elevators and had not observed any other officer using force.
 
 
 12
 Each side called a physician to give expert testimony with regard to Li's injuries. Both doctors testified that Li's fracture could have been caused by a blow from a chair or pool cue; defendants' expert testified that the injury was unlikely to have been caused by the actions attributed by Li to Canarozzi.
 
 
 13
 B. The Exclusion of the Deposition Testimony of Monk
 
 
 14
 When Monk refused to testify at trial, Li offered in evidence portions of Monk's deposition testimony taken during pretrial discovery. In order to determine whether Monk was an "unavailable" witness within the meaning of Fed.R.Evid. 804(b)(1) (prior testimony of unavailable witness not excludable as hearsay under certain circumstances), the district court questioned Monk outside the presence of the jury. The colloquy included the following:
 
 
 15
 THE COURT: Now, that testimony that you gave [in your deposition] was preliminary to this trial.
 
 
 16
 THE WITNESS: Yes, but some of the things I didn't say in that.
 
 
 17
 THE COURT: Well, you were asked questions and you answered the questions.
 
 
 18
 THE WITNESS: I answered, yes. But some of the things I did not say.
 
 
 19
 THE COURT: Well, did you answer the questions truthfully?
 
 
 20
 THE WITNESS: Yes.
 
 
 21
 (Tr. 241-42.) Defendants interpreted Monk's first two responses, "some of the things I did not say," to mean that some of the answers shown in the deposition transcript were not accurate transcriptions of what Monk had said, and defendants objected to the introduction of Monk's deposition testimony partly on that ground. The court, concerned that defendants would be unfairly disadvantaged by the introduction of the deposition testimony, ordered Monk to testify at trial. Monk, however, refused; and he indicated that the threat of being held in contempt would not alter his decision because he was already incarcerated.
 
 
 22
 Li's attorney then asked Monk, "Mr. Lee, if I asked you the same questions that I asked you at the deposition in October, would you answer the questions?" (Tr. 251.) Monk responded, "I would not answer." (Id.) Defense counsel, stating his view that Monk had indicated that some of the deposition answers as reported "were not accurate," asked the court to attempt to determine "what answers he was talking about." (Id.) The court then sought confirmation from Monk that he had answered the deposition questions truthfully:
 
 
 23
 THE COURT: .... Mr. Lee, when you were asked questions in October and you answered those questions, were your answers truthful?THE WITNESS: I refuse to answer the questions. Why do you keep asking me questions?
 
 
 24
 THE COURT: You refuse to answer that question?
 
 
 25
 THE WITNESS: Whatever questions you ask me today in court, I will not answer.
 
 
 26
 THE COURT: I thought I had asked you that earlier, and asked whether what you said [during your deposition] was the truth, and that you said something like there are things I didn't say but what I said was the truth.
 
 
 27
 Did I misunderstand you?
 
 
 28
 (Pause)
 
 
 29
 THE WITNESS: I'm very confused at the moment.
 
 
 30
 ....
 
 
 31
 THE COURT: Has [your lawyer], with an interpreter, gone over the questions and answers of your deposition with you?
 
 
 32
 THE WITNESS: Yes.
 
 
 33
 THE COURT: Are there any answers that you gave that were not truthful?
 
 
 34
 THE WITNESS: Yes, some of the answers I didn't answer.
 
 
 35
 THE COURT: But when you answered, when you gave an answer, did you give an answer that was truthful?
 
 
 36
 THE WITNESS: Your Honor, you continue asking me questions. You want me to answer again.
 
 
 37
 No matter what time you are going to give me, I'm willing to stay in jail.
 
 
 38
 (Tr. 251-52, 254-55 (emphasis added).) Neither the court nor the parties sought to ask Monk any further questions.
 
 
 39
 The court concluded that although Monk had no cognizable privilege to refuse to testify at trial (having waived at his deposition whatever Fifth Amendment privilege he might have had as to the subject matter to be covered at trial), he was as a practical matter unavailable within the meaning of Rule 804(b)(1) because, in the court's view, he was adamant about not testifying at trial, even under penalty of civil contempt. However, in light of Monk's statements about his answers at the deposition, the court questioned whether the deposition was sufficiently reliable to be introduced.
 
 
 40
 After reading Monk's deposition and hearing the trial testimony of Tang, the court concluded that Monk's deposition should not be admitted in evidence.
 
 
 41
 I reach that determination based on a number of factors. One is what it is that the deposition if admitted would contribute to the critical disputed facts of the case, but my primary reason for it is the serious doubts which exist as to the accuracy of the deposition. Namely, the deponent's statement to the Court that the answers that he previously gave in the deposition were not full and complete answers, and so whatever indicia of reliability would normally attach to a deposition is diluted by the affirmative statement of Mr. Lee that his statements at this deposition were not full and complete responses.
 
 
 42
 With respect to the critical issue in the case, and that is what happened to the plaintiff, the deposition would cast little light other than what is contained in the testimony of Tang and otherwise in the record.
 
 
 43
 (Tr. 419.)
 
 
 44
 Li's counsel later renewed his proffer of the deposition testimony, proposing that the court allow him to read to the jury the relevant portions of the deposition, along with Monk's in-court responses "that, one, the answers that he gave to the specific questions were truthful, and, two, he did not tell everything that he knew about the incident." (Tr. 663.) After reviewing the pertinent parts of Monk's deposition, the court noted that, when asked what he had seen happen to Li in the elevator, Monk gave no answer that was particularized as to Li. The pertinent passages included the following:
 
 
 45
 "Q. You told us that you and Gum Pai and Tang were beaten up in the elevator. How do you know that Gum Pai was beaten up in the elevator?
 
 
 46
 "A. I just know that the three of us were beaten up inside the elevator.
 
 
 47
 "Q. How do you know Gum Pai was beaten up?"A. I don't know how to answer your question.
 
 
 48
 "Q. Did you see him being beaten up?
 
 
 49
 "A. I saw [that] all three of us were being beaten up."
 
 
 50
 (Tr. 665 (quoting Monk deposition transcript ("Monk Dep.") 15 (bracketed word in deposition)).)
 
 
 51
 "Q. Who else besides yourself was beaten up, sir?
 
 
 52
 "A. I don't know how they were beaten up but we were all being beaten up."
 
 
 53
 (Tr. 664 (quoting Monk Dep. 12).) Noting that "what this case really turns on is the allegation that somebody jumped on [Li] when he was on the floor of the elevator" (Tr. 666), the court pointed out that Monk did not so testify. For example, while Monk testified in detail as to the assault on himself, he never said he saw any officer hitting, kicking, or stomping on Li; and although Monk gave wholesale responses that he saw "all three" of the inmates being beaten up, he did not give responsive answers indicating eyewitness observation of a beating of Li when the question focused specifically on Li. Thus, the court noted that "[w]hen he's asked what he saw happen[ ] to the plaintiff, he doesn't testify." (Tr. 664.) The court adhered to its earlier ruling that Monk's deposition testimony would be excluded.
 
 
 54
 Explaining that ruling further after trial, the court pointed out that satisfaction of the elements of Fed.R.Evid. 804(b)(1) "does not immunize prior testimony from the scrutiny accorded any other testimony under the Federal Rules of Evidence," Opinion dated April 9, 1997 ("Opinion"), at 14, and that the court had excluded the deposition testimony pursuant to Fed.R.Evid. 403 because
 
 
 55
 the deposition [was] less than credible in light of Monk's own statements during an examination by the Court outside the presence of the jury, too vague to be probative, and cumulative with the testimony of Tang and the plaintiff.
 
 
 56
 Opinion at 9-10. The court pointed out that
 
 
 57
 Monk was asked three times during his deposition about the assault in the elevator. While he offered some details as to the assault on him (that he was struck with a "walkie-talkie"), he was vague as to the nature of the alleged assault on the plaintiff. He was also unable to provide details as to plaintiff's physical condition, or whether he appeared to be in pain, prior to the elevator ride but after the inmate fight on 11 South, or as to the nature of plaintiff's injuries once they both arrived on 9 South. Monk's prior testimony could not have led the jury to the specific conclusion that plaintiff's arm was broken in the elevator. Nor could it have assisted the jury in determining whether, even if plaintiff's arm was broken by an inmate during the fight on 11 South, the defendants' treatment of him once in the elevator violated his constitutional rights. As such, if admitted, it would not have had a material effect on the outcome of the case.
 
 
 58
 While wary of usurping the fact-finding function of the jury, and cognizant of the jury's role in weighing the credibility of testimony and evidence, the Court found Monk's prior testimony inadmissible because Monk himself--not the Court and not the parties--raised serious questions about his veracity.
 
 
 59
 Id. at 13-14.
 
 
 60
 In submitting the case to the jury, the court instructed that no inference was to be drawn against either side from the fact that Monk was not called as a witness. The jury was asked to answer the following threshold question:
 
 
 61
 Has the plaintiff, Jian An Li, proven by a preponderance of the evidence that any Bureau of Prisons employee or employees violated plaintiff's constitutional rights by assaulting him in an elevator in the MCC on the night of November 10, 1994?
 
 
 62
 The jury answered that question in the negative, and judgment was entered dismissing the complaint. The district court denied Li's posttrial motion for judgment as a matter of law or for a new trial. This appeal followed.
 
 II. DISCUSSION
 
 63
 On appeal, Li seeks a new trial, contending that Monk's deposition testimony was reliable and had probative value, and that it was neither cumulative nor unduly prejudicial to the defendants. He argues, inter alia, that the court impermissibly weighed Monk's credibility in determining whether the deposition testimony should be admitted. He also argues that the court's citation of Rule 403 in its posttrial Opinion was an after-the-fact rationalization that had not been the basis for the decision at trial. We are unpersuaded by any of his arguments.
 
 
 64
 Under Rule 804(b)(1), the prior testimony of a person who (a) is unavailable, and (b) has testified at a proper deposition at which the party against whom the testimony is offered had an opportunity and similar motive to cross-examine him, is not excluded by the hearsay rule. Fed.R.Evid. 804(b)(1). The fact that prior testimony meets the criteria set by this Rule and hence is not excludable on the ground that it is hearsay, however, does not make it admissible. The court retains its normal discretion to exclude the evidence on other grounds such as lack of relevance, see Fed.R.Evid. 402, improper purpose, see, e.g., Fed.R.Evid. 404, or undue prejudice, see Fed.R.Evid. 403. See, e.g., United States v. Ricks, 882 F.2d 885, 892 (4th Cir.1989), cert. denied, 493 U.S. 1047, 110 S.Ct. 846, 107 L.Ed.2d 841 (1990); United States v. King, 713 F.2d 627, 632 (11th Cir.1983), cert. denied, 466 U.S. 942, 104 S.Ct. 1924, 80 L.Ed.2d 470 (1984).
 
 
 65
 Under Rule 403, evidence that is relevant and otherwise admissible nonetheless "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, ... or by considerations of ... needless presentation of cumulative evidence." Fed.R.Evid. 403. Application of this Rule requires a balancing analysis, and the trial judge has broad discretion to weigh the probative value of the evidence against the negative factors. See, e.g., United States v. Abel, 469 U.S. 45, 54, 105 S.Ct. 465, 470, 83 L.Ed.2d 450 (1984); United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1193 (2d Cir.), cert. denied, 493 U.S. 933, 110 S.Ct. 324, 107 L.Ed.2d 314 (1989); United States v. Jamil, 707 F.2d 638, 642 (2d Cir.1983). Because the trial judge sees the witnesses, the parties, the jurors, and the attorneys, and is thus in a superior position to evaluate the likely impact of the evidence, we will not overturn his ruling unless he has acted arbitrarily or irrationally or has otherwise abused his discretion. See, e.g., United States v. Eisen, 974 F.2d 246, 263 (2d Cir.1992), cert. denied, 507 U.S. 998, 113 S.Ct. 1619, 123 L.Ed.2d 178 (1993); United States v. Imran, 964 F.2d 1313, 1316 (2d Cir.), cert. denied, 506 U.S. 1009, 113 S.Ct. 626, 121 L.Ed.2d 558 (1992); Purnell v. Lord, 952 F.2d 679, 685 (2d Cir.1992); United States v. Jamil, 707 F.2d at 642.
 
 
 66
 We see no such flaw in the exclusion of Monk's testimony on the ground that its probative value was substantially outweighed by its potential for unfair prejudice. Preliminarily, we reject Li's contention that the court did not rely on Rule 403 in making its ruling at trial. When the court found insubstantial "what ... the deposition if admitted would contribute to the critical disputed facts of the case" (Tr. 419), it plainly was assessing the evidence's probative value; and when it described, inter alia, "the serious doubts which exist as to the accuracy of the deposition" (id.), it was assessing the potential for unfair prejudice. Although the court did not cite Rule 403 by number at trial, it is clear that its ruling was based on that Rule.
 
 
 67
 Nor do we agree with Li's contention that the district court's Rule 403 conclusion was based on its view that Monk's deposition testimony was not credible. (See, e.g., Li brief on appeal at 26 ("Whether or not the Monk was to be believed presented a classic jury question, and the court lacked authority under Rule 403 to prevent the jury from hearing this evidence simply because the court doubted its reliability.").) Li argues that "[w]hile a court may properly balance relevance under FED.R.EVID. Rule 403, it certainly cannot balance or otherwise assess reliability under this Rule" (Li brief on appeal at 25 (emphasis in original)), relying on authority that states that in the Rule 403 balancing process, the court is not to consider the witness's "credibility." In so arguing, Li confuses two issues. The credibility of Monk's testimony is not the same issue as the reliability of the transcript. Although in its posttrial explanation the district court stated that the "deposition" was "less than credible." Opinion at 9-10, it was expressly mindful of the respective roles of judge and jury, see id. at 14, and in excluding the deposition it did not purport to evaluate the credibility of the testimony. Whether or not a witness's testimony is to be believed does not become an issue unless it can be determined what the witness has said and whether he has completed his answer. The court's concerns--including its "serious doubts ... as to the accuracy of the deposition" (Tr. 419)--focused squarely on the reliability of the deposition to resolve those two threshold matters. We conclude that the court did not assess credibility in weighing either probative value or potential for unfair prejudice in its balancing under Rule 403.
 
 
 68
 As to the court's evaluation of probative value, we see no basis for overturning its assessment that Monk's testimony would have added little to that of Tang, for the responses of both men ran along quite parallel lines. For example, both testified that they did not notice whether Li had any sign of injury prior to boarding the elevator; both described their own respective assaults by corrections officers; both said they were struck with portable telephones; and both stated that they could not describe what happened to Li because they were being beaten themselves. Li nonetheless contends that Monk's testimony was essential because Tang, although initially stating that Li had been beaten during the elevator trip, admitted that he had not actually seen that occur. But Monk's deposition testimony was little different. Tang testified, "My head was pushed against the wall. I could not see." (Tr. 386.) Monk testified, "At that time when I was being beaten up badly myself, how can I tell you how the other people was [sic ] being beaten up?" (Monk Dep. 15.) Monk did not testify that he had seen anyone hit Li in particular; rather, he would say only, "I saw that all three of us were being beaten up" and "I just know that the three of us were beaten up inside the elevator." (Id.) When asked the straightforward, particularized question, "How do you know Gum Pai was beaten up," Monk said, "I don't know how to answer your question." (Id.) The weight to be given to such a series of answers, if admitted, would, of course be for the jury. But the court was entitled to view Monk's testimony as differing little from that of Tang.
 
 
 69
 Further, the court's view that Monk's deposition testimony posed a serious risk of unfair prejudice to defendants was amply justified. First, when the court questioned Monk about his answers to the deposition questions, it is not entirely clear what Monk's initial caveat--"some of the things I did not say" (Tr. 241-42)--meant. That caveat could be interpreted either as meaning that the deposition transcript contained answers that he did not give, or as meaning that he did not give complete answers to the questions. The former interpretation may well be supported by his later statement that "some of the answers I didn't answer " (Tr. 254 (emphasis added)). Whichever he meant, it seems clear from Monk's statements that the deposition transcript did not reflect the whole truth and nothing but the truth.
 
 
 70
 Second, although Monk initially stated that he had answered the deposition questions truthfully (Tr. 242), later, in response to the court's question "Are there any answers that you gave that were not truthful," Monk began his answer with "Yes." (Tr. 254 (emphasis added)). That affirmative response appears to mean that some of his answers at the deposition were not truthful. It is not clear whether his subsequent words, "some of the answers I didn't answer," were intended to contradict that affirmative response, and the court, though it tried, could not get clarification because of Monk's recalcitrance. Thus, when the court pursued the matter by asking, "But when you answered, when you gave an answer, did you give an answer that was truthful," Monk refused to respond or to clarify. (Id.) Indeed, he would not even confirm whether he had earlier stated to the court that "there are things [he] didn't say but what [he] said was the truth." (Tr. 252.) In sum, the record was left in a state of equivocation, as Monk had responded, without clarification, that his answers were truthful, that some of his answers were not truthful, and that "some of the answers [he] didn't answer."Finally, Monk's refusal to respond to clarifying questions made it impossible even to determine which answers Monk meant were incomplete or untruthful or which parts of the transcript he considered inaccurate. The court's conclusion that the admission of the deposition testimony would expose defendants to an undue risk of unfair prejudice was plainly neither arbitrary nor irrational.
 
 
 71
 In the circumstances, we conclude that the trial court's decision to exclude the deposition testimony on the ground that its probative value was substantially outweighed by its potential for unfair prejudice cannot be considered an abuse of discretion.
 
 CONCLUSION
 
 72
 We have considered all of Li's arguments on this appeal and have found them to be without merit. The judgment of the district court is affirmed.
 
 
 
 *
 Honorable Peter K. Leisure, of the United States District Court for the Southern District of New York, sitting by designation